## UNENFORCIBLE AGREEMENT RELATING TO THE DESCENT OF PROPERTY TO ADOPTED CHILDREN.

Common Pleas Court of Columbiana County.

ANNA MARY ARTER ET AL V. JOHN S. ULERY ET AL.[*]

Decided, January 29, 1912.

*Adopting Parent Enters Into a Parol Agreement—Making Adopted Children His Heirs—Difficulty in Establishing the Contract—But if Proven it would Fall Within the Statute of Frauds.*

A parol agreement entered into between a childless couple and the father of two children, whereby the childless couple undertook to adopt the children and make them their heirs and give them their property at death, is unenforcible, even if established by satisfactory evidence, where the estate which the children claim many years later under the agreement consists in part of realty and the agreement is not taken out of the statute of frauds by part performance or a showing of fraud.

MOORE, J.

This case has been submitted to the court upon the pleadings and the evidence. In the petition the plaintiffs claim that about November 29, 1887, James D. Ulery and Sarah Ulery, his wife, being childless, entered into a contract with Peter Schmidt, the father of plaintiffs, to adopt as their own, the said Anna Mary Schmidt, now Arter, as their own child, change her name to that of Ulery, and in every respect treat her as their own child, and agreed to make said Anna Mary Arter their heir and give her their property at their death. It is alleged that Peter Schmidt agreed to and did relinquish and give up all care, control, society and affection of his daughter to said James D. Ulery and wife, and signed a written consent for her adoption by said Ulery and wife. On June 15, 1889, the same agreement was made between the same parties relative to said Louisa

[*]Affirmed by the Circuit Court without opinion, October, 1912; judgment of the Circuit Court affirmed by the Supreme Court without opinion, *Arter* v. *Ulery et al*, November 17, 1914.

Schmidt, now Hanna, except that it is alleged that in the agreement relating to Louisa she was to be made joint heir with said Anna Mary; the property of the Ulerys to be divided one-half to Anna Mary, and one-half to Louisa. The first agreement as to Anna Mary was not set aside or abrogated.

Although the first agreement was that Anna Mary was to have all of the property at the death of the Ulerys, it is alleged that the Ulerys agreed in 1889 to give one-half of what they had agreed to give to Anna Mary to Louisa. It is alleged that Peter Schmidt and his two daughters fully complied with the alleged agreements; the two girls were taken by the Ulerys and lived with and were introduced and known as Ulery's daughters, and probably married under the name of Ulery. Mrs. Ulery did give her property by will to the two girls, amounting to, as the evidence shows, $12,000. The real and personal estate of James D. Ulery is set out in the petition, and it is claimed under the contract by the plaintiffs, and specific performance is prayed for. These contracts were verbal. The evidence shows that in 1883 the mother of plaintiffs died at Alliance, Ohio, leaving surviving her, her husband, Peter Schmidt, and five small children, among whom were the plaintiffs. Peter Schmidt was a poor man, and his family of children soon scattered, one to Columbiana, one to Salem, and Anna Mary to Mangus, and the other two probably remained with Peter. Mention was made of sending somebody, probably Anna Mary, to the children's home, but it was not done. I have no doubt but that friends of Peter were looking up some suitable place for all of the children, and when an opportunity came to place them at Ulerys they were there permitted to go, and it was for the best interest of the children that they should go there. Peter then knew but little, if any, English. Karshner and Mangus acted as sort of interpreters for him, and he now, after twenty-seven years, undertakes to tell us, in his broken way, the alleged contract, and he is the only living witness thereto.

The evidence shows that Mrs. Ulery first came for, contracted about, and took away from Alliance Anna Mary, and James Ulery was not along; then in the summer Karshner, now dead, and Peter Schmidt went down to Ulerys and there some talk

was had; James D. Ulery and his wife were both present, Karshner interpreting to Peter what was said. Peter said James D. Ulery spoke of adopting Anna Mary at that time; the answer and consent for adoption was signed by Peter, but not much said about the property. He says that as it was interpreted to him, James D. and Mrs. Ulery said when they were dead their property would go to Mary. Then a year or so later, in 1889, they came to Alliance, said Louisa would be nice company for Anna Mary, and they would adopt Louisa on same condition as Anna Mary, and Louisa was taken by Ulerys then or a short time later. The petition alleges that Louisa was to have one-half, but the testimony of Peter says she was to be adopted on the same condition as Anna Mary. He says he signed a consent for adoption of Louisa at that time  The evidence shows that he did sign both consents, but neither James Ulery or Mrs. Ulery ever signed any petition for adoption of either of the girls, and the fact that the petitions were never signed seems to bear out the theory that James D. Ulery had not agreed to sign the papers. His wife may have been willing to do so, but evidently James D. refused. I can imagine some reasons why he was not making the contract, but was willing his wife might (so far as she was concerned) do so. Peter says he never saw James D. Ulery except at the two farms. Mangus says that when Mrs. Ulery came for Anna Mary, the conversation was that she would take Anna Mary, and if she liked her she would adopt her as her own daughter, but James D. was not there. Peter was satisfied, and Mrs. Ulery that day took Anna Mary away from the home of Mr. Mangus. Mr. Mangus says that Mrs. Ulery said she did all the business, and if they liked her they would adopt her (meaning Anna Mary). It is clear that the girls were good girls, well reared, behaved as children should toward Mr. and Mrs. Ulery, and gave them their respect and services, living with Ulerys as their own children, under the Ulery name, and as members of the family of Mr. and Mrs. Ulery.

Mrs. Ulery died January 24, 1904, and James D. Ulery died July 13, 1911, and this suit was begun August 7, 1911. There is no evidence to show that Peter Schmidt or his daughters,

during all the years mentioned, ever sought to ascertain if any adoption had been made on the records of the courts. Both girls were married when they were about nineteen years of age. Now, without deciding that there was a contract or contracts such as is alleged, I am going to assume that the evidence sustains both contracts. If the case rested entirely upon the existence of the alleged contracts I might have some doubt about the same being proven by that clearness required by law in order for the court to decree specific performance. Such claims made after so many years have gone by, and when all the witnesses thereto, but one, are dead, and that one, of course, interested, for his daughters' sake, are to be scrutinized carefully by courts, before taking property out of its natural and sending it into an unnatural course.

However, as I have said, let us assume the contracts as alleged are proven. And let us overlook the attempt by the second contract to give to Louisa one-half of what had already been contracted away to Anna Mary. It is claimed that these contracts should be specifically performed because of fraud of James D. Ulery, but the claimed fraud consists only in the fact that James D. Ulery did not perform his contract, did not adopt the two girls according to the forms of law so as to make them his heirs at law.

This is not the kind of fraud spoken of in the case cited in 33 O. S., pages 35 to 52. In that case the frauds spoken of are those of one person agreeing to buy for another with the other's money and taking title in his own name, and the court says on page 50:

"Fraud is so multifarious in its forms that it would be dangerous to attempt a definition of the powers of a court of equity in such cases. Each case depends upon its own facts and circumstances. It may be said, however, that in all such actions, the action is brought, not on the verbal agreement, but because of the bad faith, fraud, and injury in refusing to perform it. As in the case of a verbal contract to sell land, equity only intervenes when it would be a fraud and injury not to enforce it."

And yet equity will not decree specific performance of a verbal contract relating to land, where the part performance

is only the payment of the purchase price in money or in service. 38 O. S., 331; 37 O. S., 402.

In the case of *Crabill* v. *Marsh*, 38 O. S., 331, in the opinion on pages 338 and 339, it is said:

"And a mere refusal to perform a parol agreement, void under the statute of frauds, is in no case fraud, either in law or equity. *Wheeler* v. *Reynolds,* 66 N. Y., 227."

In the case at bar the action is upon the alleged agreements, not upon fraud, if any there was. If there was any fraud it simply consisted of the refusal or neglect of James D. Ulery to adopt said plaintiffs in the forms required by law to make them his heirs at law, and such refusal or neglect is insufficient to constitute fraud in such cases. The only part performance in this case was the surrender of the plaintiffs by their father to the Ulerys, and the plaintiffs residing with and being reared by Ulerys as their children and members of their family, and the services and affection by the plaintiffs for the Ulerys. In my opinion that is not enough.

In *Shahan* v. *Swan,* 48 O. S., 24, the court says:

"Where a parol agreement to convey an interest in land is attempted to be withdrawn from the operation of the statute of frauds, by proof of its part performance, the acts of part performance, to be sufficient for the purpose, must be, of themselves, clearly referable to some contract between the parties relating to the property in dispute."

I fail to see where the acts of part performance claimed to be such in this case are clearly referable to any contract between Peter Schmidt and James D. Ulery relating to the property of James D. Ulery described in the petition. Those acts are just as well referable to a contract between Mrs. Ulery and Peter Schmidt, as to a contract for the rearing and educating of the plaintiffs by James D. Ulery.

On page 37 of the case of *Shahan* v. *Swan,* in 48 O. S., the court says this, speaking of the contract and to what it is referable:

"First. Then it seems evident that all that can be gathered from acts of part performance is the existence of some contract

in pursuance of which they were done, and the general character of the contract; and they can not, unless possibly in some very singular case, be themselves sufficient evidence of the particular contract alleged, because they can not, in themselves, show all the terms of the contract from which they flow.''

They cite a large number of authorities to sustain that and then go on to say:

''Usually possession is the act of part performance relied on to take a case out of the statute of frauds; that, of course, always discloses the subject-matter to which it refers, and courts in discussing its sufficiency have no occasion to expressly declare that the act of part performance must refer to the subject-matter of the contract in dispute, and it is apparent that such qualification is always understood.''

Now, these contracts were in parol, were verbal—no writing signed by James D. Ulery—and the contract is clearly within the statute of frauds, and there was no such acts of part performance or of fraud as takes the contracts out of the statute, in the opinion of the court.

*Shahan* v. *Swan, supra,* is a case about like the case at bar, with one exception, as I understand it. There was no law at that time authorizing adoption—see page 31—and in that case relief was denied.

Then, to strengthen and make clear the opinion of the Supreme Court in cases such as this, we have the case of *Swartz* v. *Steel et al,* in 8 C. C. R., page 154, where it was held as follows:

''C. entered into a verbal contract with S. to adopt and make her infant daughter his heir; in pursuance of the agreement the infant, two years old, was delivered to C., and the contract was faithfully performed, except that the statutory requirements for the adoption were delayed until the daughter became twenty years old, at which time the formal requirements of the statute were complied with in the probate court, and believed by the parties to be legally valid, and so treated by C. and S., her daughter, until their deaths.

''*Held*: That the writing and part performance under it, take the case out of the operations of the statute of fraud, and the daughter became the heir of C.''

That case was almost like the one at bar, except as I shall mention a little later, and, indeed, a stronger one, for the Carnahans admitted their agreement, and thought they had complied with it, and treated it as complied with, and yet the circuit court decision was reversed by the Supreme Court in the case of *Steel et al* v. *Swartz, Guardian, et al*, 55 O. S., 685, and the judgment and decision of the common pleas court was affirmed on the authority of *Shahan* v. *Swan*, 48 O. S., 25.

Now, I have read a very excellent brief, a very able brief I might denominate it, presented by counsel for plaintiffs. There is but one distinction that they present to me to which I have given very much consideration, and that is this: that my attention is called to the fact that the difference between the case of *Swartz* v. *Steel*, as reported in the 8th Circuit Court Report, has nothing in it saying that it was agreed that the property of the Carnahans should be given to the children; that all they agreed to do was to make her their heir; and then a case is cited in the brief, I think from Michigan, in which the judge there intimates that the contract not containing the words "and also to give the child the property," but only to make her their heir, was insufficient; that he intimates that if the contract had contained the words "and to give her their property," then the decision ought to have been otherwise in the Michigan case. It is not true of the *Shahan* v. *Swan* case. I find in the case of *Shahan* v. *Swan*, on page 31, these words:

"The contract provides generally that she shall be made the heir to Mr. Woodbridge and shall succeed to his property at his death."

So it does not make any difference what the circuit court said if that case did not have those words in it. *Shahan* v. *Swan* has those words in it, and that they (the Woodbridges) agreed, that they would take the child and make her their heir, and adopt her as their own, and that she should succeed to and have all the property of the Woodbridges at their death; and that contract was fully and completely performed by the Woodbridges and by their daughter, and yet the Supreme Court refused relief, and as I have said, they reversed the circuit court in the 8th Circuit Court case.

I, therefore, feel that in view of the judgment of the Supreme Court in *Shahan* v. *Swan* and *Steel* v. *Swartz, Guardian,* I must deny plaintiffs, Anna Mary Arter and Louisa Hanna, the relief prayed for in this case. If the facts as developed in this case are sufficient to grant to plaintiffs the relief prayed for, I would very much prefer that it be granted by some higher court than this.

For the reasons given, the petition of the plaintiffs will be dismissed, and at their costs, and judgment is entered accordingly. Notice of appeal given and bond fixed at two hundred dollars.